Welcome to the Court of Appeals. We are prepared to hear argument for the first case today, Cahaly, I hope I got that right, v. LaRosa. So we'll hear from the appellants first. Ken Woodington, III May it please the Court, I'm Ken Woodington with the law firm in Columbia, South Carolina, representing all of the appellants who are basically the state for purposes of this case, I would say. This is a cross appeal. The defendants who I represent have appealed the district courts holding the South Carolina robocall statutes unconstitutionally regulated political robocalls. Plaintiff, in turn, has appealed the dismissal of his damage claims. During this first segment of the argument, I will deal with, unless asked otherwise, only my appellant issues, that is, the constitutional questions, and save the damages and any other issues for reply. The facts of this case are quite simple, as I'm sure the panel is aware. The plaintiff was arrested pursuant to an arrest warrant approved by a magistrate for placing political robocalls, robocalls of a political nature, without operator assistance. This kind of case is probably good, just go right to the issue, because you've got some keen issues here, and we do know the facts. I mean, you can intertwine the facts as you've seen us, sir, but it might be good to just go right to it. That was as far as I was going to go with the facts, because I figured I didn't need to go any further. I did want to say one thing, just as a preface, a little technical, perhaps hyper-technical, semantic issue that I sent a 28-J letter on. Depending on what you consider a robocall, the statute bans completely robotic, completely automatic, non-operator-assisted phone calls, which is the way I've been using the term robocall. I mean, a totally automatic matter without a person involved at all. In that sense, it bans those completely. Well, not really, because it just bans a subcategory of the calls, political and commercial. Well, it bans, and in so doing, bans the vast majority of the calls, we would say. Well, but that's the problem, isn't it, that it doesn't purport to ban them all, and if in fact the concern is that citizens and consumers are offended by the nature of these calls and troubled by them, then why is a call outside of that rubric any less offensive or troubling? I would submit, as we've argued in the brief, that the thing that makes these calls offensive, consumer calls and political calls, is simply the volume of the calls. And what in the record supports that notion? I would submit, well, there are two things about that. One is, I think it's a matter of common knowledge and judicial notice that people get a lot of political robocalls during election season. As the Court's well aware, there are tons of cases from the circuit and elsewhere that hold that a matter of common knowledge can be judicially noticed. It's also judicially a matter of common sense, and that if you cut down a large number of, a large segment of the volume of a problem, then you've addressed that problem to that extent. Another aspect of that, aside from the judicial notice, you said where is it in the record? This case was decided by the District Court on summary judgment without a hearing. Now, I know that's perfectly all right, and there's no due process issue involved there. But the Court never really got anywhere close to the issue of is there a volume problem with these calls. And what the District Court held was that apparently said that, okay, it discriminates on the basis of content, it's done, it's over with, you lose. And we didn't really get into, we didn't get as far as what's the basis for the discrimination being political and consumer versus other. I want to make sure, and I'm following up on Judge Diaz's question, it seems like the first determination we have to make is whether this is content-based or content-neutral. Correct. And I think that's where we are on this. And if you will, speak to that in terms of our own Fourth Circuit law, which I think the Wagmore-Dogg case has some application to it. But, you know, there is this determination in terms of the way Judge Diaz has postulated. I mean, it is, you are limiting some speech. So I, you know, speak in that terms, in terms of whether this is content-based or content-neutral speech. And I'm, let me ask you, if it is content-based, I think we pretty much can agree then it's unconstitutional. Is that right? I am not quite willing to go that far. Okay, just deal with that, we'll deal with that aspect of it later. I thought we could be together on that. But it would be tougher, let's put it that way. We know that. Oh, everybody knows that. Strict scrutiny is very tough. Well, obviously I don't need to explain to Judge Diaz what was said in Brown and what was said in Wagmore-Dogg. And really what it boils down to is why, not whether, the government is distinguished on the basis of content. And in order to use an example, I hope the court can bear with me for about 30 seconds or so, something that's robocall related, a hypothetical that's robocall related. What if here during basketball season the ACC decided to put out a robocall to everybody within the state that has an ACC team in it and starting two months ago and said, okay, just want to let you know, the season's going full swing and the games are scheduled for this day, this day, and that day. And they do it every day. And it ramps up as tournaments come in. Just want to let you know that Duke is playing Virginia tonight or what have you. And then they start even more and start every half hour and start giving you scores. And the next year the legislature comes up and passes a statute that says no robocalls involving basketball scores or the status of basketball play in general can be made. And if a plaintiff such as this plaintiff were to come into this court, he'd say, well, you know, you're distinguished on the basis of content. You banned all robocalls about basketball. And that's a content-based distinction. And the answer to that would be to come back and say no. It uses that as the means for discriminating. But the real reason it's being done is because there's so many of these doggone robocalls on that particular subject that we want to ban, eliminate so much pro tanto, that amount of robocalling. So isn't that what we're talking about? Are we going to look at what it looks like, which is content, as opposed to the reason or the basis or the state having done it? Isn't that kind of where it divides in terms of the difference of opinion? I think the way the court has stated it in the Brown case, and, of course, naturally I can't find the quote, but the basic concept is do you regulate on the basis of some other aspect than content? In other words, is the substance of content the reason you're doing it or is it because of some other characteristic that has that content? In this case, again, it's volume, common knowledge. Consumer calls generate a lot of volume. But to answer Judge Diaz's question initially about where that is in the record, because you're talking about it's common knowledge, you're acknowledging it's not supported by the record. I can't say otherwise. Right, okay. And, again, that brings me back to that point I was mentioning a minute ago. We didn't have a hearing. If this had come up in the course of a hearing, and I'm not trying to make apologies or excuses, and we're on summary judgment, I'm the defending party on summary judgment in this instance, I would have asked for a Rule 56E for some time to address that issue and come back a little bit later and address it. And also, of course, this court recently in the Reynolds against Middleton case remanded a case in order to develop a record on something. And, again, I mean, it would be a pretty easy record to develop, to get somebody to come in and testify. That's why I think it's judicially noticeable and not even necessary. Get somebody to come in and testify that, yes, by golly, we get a lot of volume of political robocalls. The flip side of it is my opponent has not shown at all that there's some vast number of other calls that are escaping the net here. You know, nobody's really identified a large volume of robocalls that are neither political nor consumer-directed that are somehow being missed as a result of this. But, again, as a fallback, I would ask that if nothing else, the court remanded for the taking of evidence on that limited. But why weren't affidavits presented in the first instance? Just never got that far, Your Honor. But you said the case was decided at summary judgment. It was, but, again, without a hearing, without a give and take to see what the concerns were. Well, I mean, the hearings are not ñ hearings are the exception in district court in cases. I would just ask, since we have an important statute in the state of South Carolina, that if nothing else, we'd be given the opportunity for a remand to take evidence on that limited matter. It was done recently. It doesn't help us in determining what is content-based and what is content-neutral because we can look at this statute and we've got cases that tell us how to do that. How does that ñ the taking of evidence may deal with ñ are we dealing with ñ are you speaking to the as-applied basis? No, just speaking of does this discriminate on some basis other than content, i.e., volume? Is that the basis on which the discrimination has occurred, the distinction has been made, volume of cause? Have we caught the vast majority of the volume? Have we caught enough of the problem? You know, there's a whole line of First Amendment cases, not the least of which is National Federation of the Blind from this circuit, that says you don't have to address each and every instance of a problem in order for a regulation on speech to be valid. But you do have to have a problem, and I guess that's the issue here, is whether or not there really is a problem. Well, there is a problem, and there was another evidentiary aspect that the district court spoke of, which is clearly one that this court can take notice of. In fact, in Wagmore Dogs, the court said that you don't have to reinvent the wheel as to whether these are a nuisance or not. And Judge Childs wouldn't even give us that, basically. She said, no, we haven't shown anything. We haven't shown evidence of legislative intent. The statute itself, it's a pretty easy piece of discernment from the statute to see that the intent was to reduce the number of robocalls. And in so doing, it got political robocalls. You could just ban all robocalls, and then you don't have to worry about it. It seems like the law is pretty clear on that. The law is very clear on that, and that's part of the problem. I mean, there is this whole body of law that says that a statute, a regulation of speech, is not doomed simply because it regulates less than the whole universe of the speech that it could have addressed. But that's what Judge Childs in effect held, the district court in effect held, that yes, you have to regulate it all or you can't regulate any of it. I know in the Ninth Circuit case of Moser, I think, the court there said, probably in dicta, but said that you don't have to regulate all the robocalls. You can carve out a piece of it and just regulate that. Well, I mean, you just indicated that there may not be another bucket of calls that cause the same level of problem in terms of volume, but are you suggesting that if you had simply focused, if the legislature had simply focused on political robocalls and let commercial calls go through, that that would not have been problematic in terms of a sensorial intent? Well, probably that would have represented a sensorial intent, to be honest with you, but that is political. There are far fewer, probably far fewer political calls, at least in the late 80s and early 90s when this statute was enacted, than there were commercial consumer calls. Obviously the number of consumer calls has gone down not just because of this statute but also because of the federal statute. But, yeah, I mean, again, that would be picking out a relatively small portion, well, I don't know how small it is, but a much smaller portion of the universe than banning political and commercial. Again, I mean, you know, you take a case like Discovery Network, which said we're going to ban about 50 newsstands in a town that had 2,000 of them. That's a classic example of your under-inclusive regulation where you're not really addressing very much of the problem and, in fact, where it appears there's some sort of sensorial intent or animus involved. Here, unlike some other cases from this circuit, there's no animus involved, there's no sensorial intent, there's no secret hidden agenda to ban. Does our case of Covenant Media have an application here? I think Covenant Media is just signs and on-premises and off-premises, and they had an easy distinction that on the premises you're just telling people about the business and off the premises you're advertising. So you're saying the cases dealing with signs and things of that nature that talk about content neutral would have no application here? No, I think the principles, in fact, we rely on several of the sign cases, Widenmoor Dogs and... I was speaking more to the determination of what is content neutral and treatment within Covenant Media. Does that have application here? Well, I think Covenant Media uses the same test that was used in Brown v. Carry and Widenmoor Dogs. The one thing about this case, I mean, and this court has said this... Well, tell me, when you apply that test, the three-prong test there, when you apply it here, why is this not content-based? Because it's a place restriction, the place being cyberspace, the place being the private channel communication of phone calls, because it doesn't discriminate on the basis of the ideas expressed in the robocalls. All viewpoints within the robocalls are banned, equally banned. But that point goes to the fact that you have a category of speech, political, but you're saying the viewpoints within that category are not discriminated against? Obviously they're not. I mean, it doesn't favor one side of the debate. But you can discriminate on a category? In the cases that involve that, and I see my time's up, if I can just answer that question. Yes. If you're talking about the cases that talk about taking the whole topic off limits, the classic one is Con Ed, about a 30-year-old Supreme Court case where the utility companies put basically public issue messages in their bills, and that concept arose in that case, but the case itself was actually decided on a different reason rather than the fact that it took a whole topic off the table. I think you would find that with other similar cases, Simon & Schuster, Son of Sam, Booze Against Barry, Burson Against Freeman. Well, Burson Against Freeman was a public forum, and there are a couple of equal protection cases about picketing in Chicago. But I can't find where that's a basis for it. All right, you've got a minute for rebuttal, so we'll hear from you again. All right. Mr. Holmes? May it please the Court, I'm Samuel Holmes. I'm here representing Robert Cahaley. Getting to the primary issue in this case, whether this was a content-based restriction on speech versus a content-neutral restriction on speech, there's a couple of issues that I need to emphasize, and there's a couple of issues I need to address given the defendant's arguments. First, before I get to the specific legal issues, I do want to point out that this case is different than the other cases that you have heard because this is a case involving a prohibition on political speech. And I think we can all agree, I hope we can all agree, that political speech is different than other types of speech, especially since this is involving speech occurring during a campaign. And there is a slew of decisions that say nothing is more important in our First Amendment analysis than political speech occurring during a campaign. Does it matter that at least from the legislature's point of view that it is not taking a position within the political speech that's being banned? In other words, it's not going one way or the other on it, it's just saying political speech. I believe you're asking me is it important whether or not it's a viewpoint discrimination as opposed to eliminating an entire category of speech. And to answer your question, if this was a viewpoint discrimination, and we're not alleging that it is, if it was, it would be even more unconstitutional. It is still unconstitutional because it eliminates an entire category of speech by politicians. As we point out in the brief... Well, not really. I mean, it just channels the manner in which that speech can take place. In other words, candidates can't make these automated calls, but they can call citizens directly via a live telephone call. That's different, isn't it? It is different, and you are correct that candidates can still call live their constituents. The constitutional issue is, though, when the legislature eliminates an entire category of speech, in this case political speech, from access to a medium, does that violate the Constitution? And we believe it does because it is now a content-based restriction on speech. What it's doing is regulating the manner of that speech. It's not allowing candidates to use these automated methods to make their pitch, but at the same time allowing candidates to call constituents directly. That seems to me a time, place, and manner restriction, which the courts have said generally, unless they're over- or under-inclusive, is okay. Well, this is not a time, place, and manner restriction. Instead, this is a restriction on a category of speech, and it does not eliminate all political speech. It eliminates only political speech in which there is no existing business relationship, and that's one of the issues we raise in the vagueness argument. Judge Diaz's question, I mean, we realize, you know, even if it does, it's the place of it. You still can speak. It does not prohibit this speech from being made. It's just this particular way in which it's being done is where it is, and the place and the manner you're doing it, which there seems to be some distinction. When you read Wagner, a dog, and you read other cases, there's some line of thinking that goes that we look at that as one of the prongs on a hill to determine if this is content-neutral or content-based. Yes, that is correct. As far as whether or not there's other avenues of open avenues of channel, you are correct on that. Going back to the other thing I wanted to emphasize, that the political speech, that this is a political speech case, the other thing I think I need to really emphasize is we take a position, we are asking this panel to make a decision on what the proper line of cases this case falls under because we advance that this case should be decided under the Supreme Court's decision in United States v. Stevens, which deals with depictions of animal cruelty, that it should be decided under the McCauley v. Coakley case, the Massachusetts abortion buffer zone case that just came out in the last term, as opposed to the Wagemore dogs, the Brown v. Town of Cary. I think I need to address that issue because that's one of the big issues that this panel needs to discuss. I'm just going to say, as it goes without saying, the Supreme Court is the law of the land. We think that in oral political speech issues... Before you go there, if we go with that other line of case, is the outcome different? The end result is the same. The Constitution prohibits what the state is doing in this case. But I will say that under the United States v. Stevens animal cruelty depiction case and the Massachusetts abortion clinic case, the standard in that case is simply, this court looks to see, it says, quote, that an act is content-based if it required enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred. That's very simple, and in that case, this case is clearly a content-based... Let me read you another section of McClellan and tell me whether or not you think this is the law of the land. The act, that issue was not content-based because, quote, whether petitioners violated the act depends not on what they say but simply on where they say it. Okay? And in Brown, we said a regulation is content-neutral when the regulation is not a regulation of speech but rather a regulation of the places where some speech may occur. What's inconsistent about that? There is nothing inconsistent if it is simply a regulation of the speech. If all speech... That's what I was talking about earlier with respect to my line of questioning. What the state has done in this case is simply regulate the manner in which politicians may reach their constituents. And that's the key phrase, if they regulate where politicians doing political speech regulate. They are not regulating people who, for example, want to give a weather forecast or want to say it's my birthday or in the... How difficult do you think it's going to be for the state, if this case goes back, to show that the volume of those calls are nowhere near the volume of political calls or commercial calls? Well, but the issue is has the government provided affidavits? Have they provided affidavits of the sponsors in the Brown versus Town of Cary case you were involved in? There was a hearing. There was affidavits. There was legislative intent. There was all these things that go on. And that case clearly says, clearly says the burden is on the government to establish the interest. Send it back, as they asked. Do just what you're saying because, as I understand, that wasn't done here. Well, the case in this case, this case was decided at summary judgment. After all discovery was taken care of, after everybody had opportunities to take depositions, after all the things that normally go on in litigation occurred, Your Honor. I mean, the case is where the case is. The case needs to be decided on the record. In addition...  And so we either affirm. You want us to affirm and that's it. Not send it back because they've had their opportunity. That is correct. They had their opportunity. Affirm on the record. And as Judge Childs points out, there is absolutely no legislative history. There is nothing within the legislative history. So even on remand, what would you do? There's no legislative history as to why they singled out political speech. All right. On this issue of the line of cases, are we going with the Supreme Court cases or are we going with these Fourth Circuit cases that deal with signed ordinances? And this is where I would like to emphasize that this is not a signed ordinance case. There is a lot of jurisprudence within this Fourth Circuit dealing with content-based versus content-neutral analysis. But they involve cases involving signed ordinances. I am asking this panel to not apply signed ordinance line of cases to a case involving oral speech. That's what I'm asking. Why? Why? Because as the Brown versus Town of Cary case states, oral speech is very different than signed ordinance cases because it says signs take up space. Signs can distract motorists. Signs can cause accidents. They are different. But they threw their logic from the Supreme Court case of Heal. They did. Which is a non-signed case. They absolutely did. But sometimes it's important to make differences, and this is an important difference. This is a case involving politics. It's a case involving oral speech. It's very different than a guy who scribbles, I think it was, screwed by the city of Town of Cary. I think that's what it said. You know, in big fluorescent colors. Okay? That case dealt a lot with what was the colors that he used. It was dealt with, you know, the size of the lettering that he used. It dealt with whether or not it was, depending on whether or not it was a wall sign, I think he was allowed five square feet. If it was a wall sign, it was two square feet. Arguments over what color pigment he used. But all of that, the basis for discussing all of that in the Brown case was the fact, the view that the town was regulating precisely not because of the substance of the message, which arguably is as political as what we have here, but because of the way in which that message was conveyed. I get your point that we're dealing with political speech, but even that speech is not completely immune from government regulation. If, in fact, it's done consistent with the precedents that require reasonable time, place, and manner restrictions. And that's the question here. Do we have that? And the answer is this is not a time, place, or manner. It is a subject matter. You are correct. The government, for example, I think somebody asked, can the state of South Carolina prohibit all robocalls? The answer is yes. And there are several cases that have said states can prohibit all robocalls. In that case, you would have a valid time, place, or manner restriction. Because all robocalls, regardless of what they say, are prohibited. But that's not what the government did in this point. Well, they prohibited virtually all calls. Of course, the problem is we don't have the record evidence to support that. That's what their intention is. Well, we don't know that. We don't know that. This is what we know. They prohibited political calls. And they prohibited commercial calls. And unsolicited consumer calls, but they provided exceptions for that. A debt, right? Whether or not you have a previous business relation. Okay? So the debt and contract issue raises another content issue. Because in order for the government to determine whether or not the speech is prohibited, you have to decide, is this a discussion or a debt? This is the crazy thing, I think, about this ordinance. This ordinance, or this statute, allows debt collectors to ring your phone with an automated machine to try and collect a debt, but it doesn't allow politicians to let people know about their political message. When legislators enact acts, we presume constitutionality, of course, and then we look at it and analyze it. And then in instances, as what you were saying, you're telling me that there's a part of it that makes this unconstitutional because they're doing debt. So are you saying that we then have the opportunity here to say, well, that part of the statute has to be taken out? Maybe I'm mis- It would be constitutional. I misspoke, if I'm understanding your question correctly. My only point in pointing out the debt is to, number one- Or any other category here that would make this unconstitutional. At some point in time it will become constitutional because there are exceptions, even when the blanket is there in terms of prohibiting. There are exceptions. You still can make emergency robocalls. You can make a category of calls there. So, I mean, there's a list of things that's probably in this statute. The question is, what if we say those things have to come out of the statute, therefore it's constitutional? The cases say that you can eliminate all robocalls, but those cases dealt with issues where there were exceptions. For example, the government could send out reverse 911 phone calls. Okay? But, see, that's not eliminating a category of speech. That's giving the police the ability to do a reverse 911. In this case, it eliminates a category of speech. Politics, and that's what's different, Your Honor. But even in dealing with politics and political speech, we think about the fact that you've got a legislature and, you know, it just appears that it sort of cuts on both sides of the political spectrum. I mean, I don't think there's an opposition from either party or any other party as to, I think they all want robocalls, so to speak. So the state says, no, we just don't want you invading homes. A home is a place that folks kind of don't want to be bothered with a robocall. So we're going to prohibit this here. Now, if you want to go do it some other way, we're not keeping you from doing your message every other way. You just can't keep bombarding phones that people kind of like to have in their homes. Why can't the state do that? Well, but that's, and that raises a couple of issues. The state cannot do it if it is eliminating certain categories of speech but allowing other categories of speech. At that point in time, they cross a constitutional line. But I'd like to point out that is not what they are doing in this case because, again, there are so many categories not covered, and yet for the categories covered, there's exceptions. And this goes back to our vagueness doctrine argument that we haven't even got into. For example, we argue, what does it mean that you can make a robocall if you have a previous or past business relationship? We point out in the brief, if a campaign sells a T-shirt or a hat to a person, which a lot of campaigns do, does that establish now a business relationship that would allow the politician to make that phone call? Now, that's in the vagueness, that's in a whole other section. Maybe we can get to that because we've spent all our time on whether or not it's content-based or content-neutral, which I think is at the heart of it. That's a good place to spend your time. Okay, so we deal with, because we deal with the issues of impermissibly compelled speech, which I'm going to go on my rebuttal. But on the vagueness doctrine, we point out that statutes can be unconstitutionally vague if it doesn't give fair notice as to what is prohibited, and if a person of reasonable intelligence could not understand what is being prescribed. And number two, and this is so important in this case, does it permit arbitrary or discriminatory enforcement, which given the history of the case that we lay out, this is a case that is just exactly right, of why you have one person, the director of SLED, who can make a decision as to which people he is going to enforce this against. What do you think about it insofar as your client? I mean, if it applies in this instance, clearly your client is someone who has violated, and it's clear that if your client is that and he doesn't have standing to come in and say it's vague, does he? My client has standing because there's an attorney general's opinion that specifically says survey calls are not covered by the ADA statute. And this, I need to say this because my client really wants me to say this. My client is very upset that he took the step to call the attorney general's office to ask if this was okay. Well, he didn't ask precisely if what he was planning to do was okay. He gave a very broad example and ran with it. A survey call, and then they told him to get it in writing, which is actually pretty good advice. He got it in writing, okay? The survey call... You know how many cases there are where people got an opinion from the attorney general and it went the other way on them? Unfortunately, he learned that lesson, didn't he? The attorney general makes it very clear this is not the law. If you get an opinion from this court or from a district court, that's probably something he can take somewhere, but not an opinion from the attorney general. Hold on. This is a layperson who gets a member of the House of Representatives. I think you guys understand what's going on here. He gets a member of the House of Representatives to get an attorney general's opinion saying it was okay to do it. And he is frustrated. He is frustrated. I empathize. I'm just saying the effect of it, you well know, is that that's not a court opinion. And that's what brings us here today. Thank you very much. Mr. Woodington, before you get started, I forgot to ask you this about your principal argument. Your contention is that these calls are problematic because they invade the privacy of the home. That seems to be the focus of your argument. But these calls, the statute not only bars residential robocalls but also business robocalls. Isn't that right? Yeah. And I think if you look at one of the three or four robocall cases, either Moser or Van Bergen or one of them, it says it can be just as obnoxious and just as problematical if it comes in a business context. It still interrupts your business and your opportunity to do things. The issue hasn't really been raised about whether it improperly distinguishes or lumps it all together in the context of home versus business. But I would say that it's just as intrusive in the business context, and there are a couple of cases, robocall cases, that so hold. Why debt collectors and others can't make these calls? Again, I would cite the court to Van Bergen or Moser or one of those cases that say that when you impliedly consent to that when you do business with somebody or something like that, it's something along those lines that is a different modality involved as opposed to a cold call. So in all of the exceptions here, we can either deal with it in the situation as though it's an emergency type thing or there's an implied or actual consent? That's what the cases hold. That's what the robocall cases hold. I mean the ones of this statute. We can determine that is what is here where they allow these exceptions. Either they were implied or they were actual consent or some type of emergency. Those exceptions where there are exceptions, yes. I mean not, you know. But why not have a similar exception for political robocalls? Well, I think the General Assembly in its legislative, acting legislatively, thought that was enough of a problem to ban them altogether. This court has recognized the ability to make legislative choices that don't have to be a perfect fit in such cases as Brown and Wagmore Dogs, for example. This is, again. Even though the Attorney General opinion is only advisory, isn't the fact that the Attorney General viewed this statute in one way, the SLED Director viewed it in another way, support for the argument that this statute is hopelessly vague and doesn't give fair notice? Well, no, I would say not. Because, again, I used to write Attorney General's opinions myself for about 30 years and people come in under sort of false pretenses, which I think is what happened here. But calls of a political nature, that's the literal language of the statute. A political survey call is a call of a political nature. You don't have a right to rely on an Attorney General's opinion. And, in fact, you'll notice that the Attorney General's office has joined us in this brief, so it's not just me representing the private defendants. They've come in and now effectively assert what I've been asserting here. I would say that when you take all the, well, let me offer this as a way to decide this case. First of all, if it passes content neutrality on the grounds that it's a valid time, place, and manner restriction, as I read Brown, Wagmore Dogs, and for that matter, Hilvey, Colorado, you don't have to pass all three of the content neutrality tests set forth in those cases because the court has used the term, those three tests disjunctively. And Hilvey says there are three independent reasons for finding the statute to be content neutral. If you get to the point of saying it's a valid time, place, or manner restriction, you move on to the valid governmental purpose, which is to prevent, you know, to keep people from being bothered by robocalls, substantial governmental interest in the privacy of the home. And from there is an under-inclusiveness. I don't have time to really go into those tests in any detail, but they're pretty well spelled out and it basically turns on, are you favoring one side of the debate, or are you so, have you left such a wide open door that so many horses are getting out of the barn that your purported claim for having to regulate this area is foolish, basically. I think we can pass the under-inclusiveness test pretty easily if you find it content neutral, even if it's only found content neutral on the basis of time, place, and manner. Again, I mean, residential privacy is one of the key, it's why government exists so people can be at peace in their homes. Government, people don't live in their homes so that they can be bombarded by unwelcome phone calls from people seeking office. It's the other way around. The government is there to protect the residential privacy of people in their homes. Would the church be permitted to make robocalls to its members? Without prior consent or anything like that? Members of the church, you've got 2,500 members of the church right there, plenty of those in South Carolina. Would they be permitted to make robocalls to the 2,500 members? There's no ban on it. What if the nature of the call was to exhort their members to go out and vote? I would have to call that a call of a political nature. Voting is political and that seems to be pretty simple, really. But they could call them and tell them what time service is on Sunday or that, you know. That wouldn't be political, obviously. But again, we don't have any evidence coming from the other side about what's this huge volume of robocalls that's not affected by this statute. And I would say just one more time, in Reynolds v. Middleton, this court gave the city a break, for lack of a better term, and allowed the case to go back for development of what I submit would be rather simple and easy evidence to produce and would just ask if nothing else that you accord us that where a statute comes up rather than let the statute fall. Thank you, Mr. Wood. Thank you very much. Mr. Hoppe, I suppose you want to speak to your cross-claim. I do, but I'm going to spend one minute dealing with the question that you just asked about churches giving out polls questions, because we raised that in our brief. What happens if a church uses a robocall machine to send out a message involving abortion, homosexuality? It raises issues as to whether or not this code section is unconstitutionally vague. Because can a person of reasonable intelligence know, is that a call, quote, related to a political campaign, that is how broad it is and that is how unprecise it is, or calls of a political nature? I think reasonable people of ordinary intelligence could give you different answers to the questions that you raised. I think that is being implied consent on the part of the members to receive a call from the church. Well, but you have to have a previous business relationship, okay? And if it's a nonprofit church, is that a business relationship? Going back to the issue of if a campaign sells a hat, is that a business relationship? It is unconstitutionally vague. People can give you different answers. You've got a very short time to address the cross-claim. On the cross-claim, I think that we put in our reply brief, our final reply brief, that if there was probable cause to arrest Mr. Kahaley, then the defendants would be entitled to limited immunity. We don't think that they had probable cause, okay? We don't think that they had probable cause for three reasons. Number one, my client went and got an attorney general's opinion that said political surveys are exempted from the ADA requirements. And the reason why that's important is not that he necessarily made an error. It is that under the state constitution, Article V, Section 24, that attorney general's opinion is the opinion of the chief prosecutor in this state. And we've had this discussion that attorney general's opinions are not binding on this court, and that's absolutely correct. But under our state constitution, attorney general's opinions are binding on police officers. And so that is why they could not have probable cause. In addition, the statute specifically requires that there be a prize promotion offered in the call. I know the defendants argue that that is a scrivener's error, but please look at it from the perspective of a case in which our client is being criminally charged with an offense. He did not offer a prize promotion in this call, so there cannot be probable cause. In addition, the third point on this is that if you look at the warrants, the warrants do not describe a criminal act, and for those reasons we do not think that there was probable cause. Thank you.
judges: James A. Wynn Jr., Albert Diaz, Stephanie D. Thacker